IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03091-MJW

VIRGINIA FRANCIS LAFLAN,

Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

Defendant.

**OPINION AND ORDER**

**MICHAEL J. WATANABE**
**United States Magistrate Judge**

The government determined that Virginia Laflan is not disabled for purposes of Disability Insurance and Supplemental Security Income under the Social Security Act. Laflan has asked this Court to review that decision, raising four grounds for appeal.

The Court has jurisdiction under 42 U.S.C. § 405(g), and both parties have agreed to have this case decided by a U.S. Magistrate Judge under 28 U.S.C. § 636(c). One of Laflan's arguments is correct, and as a result the Court vacates and remands the government's determination for further proceedings consistent with this opinion.

**Discussion**

In Social Security appeals, the Court reviews the administrative law judge's ("ALJ") decision to determine whether the factual findings are supported by substantial evidence and whether the correct legal standards were applied. *See Pisciotta v. Astrue,* 500 F.3d 1074, 1075 (10th Cir. 2007). "Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more

than a scintilla, but less than a preponderance." *Raymond v. Astrue*, 621 F.3d 1269, 1271–72 (10th Cir. 2009) (internal quotation marks omitted). The Court "should, indeed must, exercise common sense" and "cannot insist on technical perfection." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). The Court cannot reweigh the evidence or its credibility. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

As noted, Laflan asserts four reversible errors.

**I.      Intellectual Disability under Listing 12.05(C)**

Laflan's first argument is that the ALJ applied the wrong legal standards and/or came to unsupportable factual conclusions as to whether Laflan is sufficiently mentally retarded to be deemed disabled under Listing 12.05(C).[1]

*Legal Standards*

Listing 12.05 contains a threshold test—variously described as a "diagnostic" or a "capsule" definition—under its flush language, followed by four alternative tests for severity under paragraphs (A), (B), (C), and (D). 20 C.F.R. Part 404, Subpart P, App. 1, § 12.05. More specifically, in 2013, the listing stated:

> 12.05 *Mental retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

---

[1] In the Social Security Administration's five-step sequential process for reviewing disability claims, the third step asks whether the claimant's impairments meet or equal the conditions listed in a regulatory appendix; if so, the claimant is deemed disabled. *See, e.g.*, 20 C.F.R. § 416.920(a)(4).

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; OR
>
> B. A valid verbal, performance, or full scale IQ of 59 or less; OR
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; OR
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
>> 1. Marked restriction of activities of daily living; or
>>
>> 2. Marked difficulties in maintaining social functioning; or
>>
>> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>>
>> 4. Repeated episodes of decompensation, each of extended duration.

*Id.* (paragraph structure altered).

The listing itself does not clearly suggest that the capsule definition is to be applied separately from the severity tests—an ambiguity pointed out by the Tenth Circuit over a decade ago. *Barnes v. Barnhart*, 116 F. App'x 934, 938 (10th Cir. 2004). But since then, the Commissioner has amended the introduction to the 12.00-series listings to explain, specifically:

> The structure of the listing for intellectual disability (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing. Paragraphs A and B contain criteria that describe disorders we consider severe enough to prevent your doing any gainful activity without any additional assessment of functional limitations.

> For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, *i.e.*, is a "severe" impairment(s) . . . . If the additional impairment(s) does not cause limitations that are "severe" . . . , we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work. Paragraph D contains the same functional criteria that are required under paragraph B of the other mental disorders listings.

*Id.* § 12.00(A). Thus, it is now clear that the beginning paragraph is a separate "diagnostic description" that must be satisfied, independently of the four alternative severity tests.

Nonetheless, the regulation does not purport to establish any standard for determining when the claimant shows sufficient "deficits in adaptive functioning initially" to move onto the severity tests. In fact, the government has provided no guidance at all for applying this language, instead offering the following explanation for why it has *not* adopted specific guidelines:

> *Comment*: One commenter recommended that we use the definition of mental retardation (MR) found in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) (DSM-IV), published by the American Psychiatric Association, as the definition of MR in listing 12.05 and 112.05.
>
> *Response*: We did not adopt the comment. The definition of MR we use in our listings is consistent with, if not identical to, the definitions of MR used by the leading professional organizations. The four major professional organizations in the United States that deal with MR have each established their own definition of MR. While all the definitions require significant deficits in intellectual functioning, as evidenced by IQ scores of approximately 70 or below, age of onset and the method of measuring the required deficits in adaptive functioning differ among the organizations.

5

> For example, the definition of MR used in the DSM-IV is predominantly based on (but not identical to) the revised definition of MR promulgated by the American Association on Mental Retardation (AAMR) in 1993.  The DSM-IV states: "The essential feature of mental retardation is significantly subaverage general intellectual functioning (further defined as an IQ standard score of approximately 70 or below), that is accompanied by significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.  The onset must occur before age 18 years."
>
> Following publication of this new definition of MR by the AAMR, the American Psychological Association published its own "Manual of Diagnosis and Professional Practice in Mental Retardation, 1996."  It states: "Mental retardation refers to (a) significant limitations in general intellectual functioning; (b) significant limitations in adaptive functioning, which exist concurrently; and (c) onset of intellectual and adaptive limitations before the age of 22 years."  In its definition, (a) is defined as "* * * an IQ or comparable normed score that is two or more standard deviations below the population mean for the measure;" and for (b), "* * * the criterion of significance is a summary index score that is two or more standard deviations below the mean * * *."
>
> The definition of MR used by SSA in the listings is not restricted to diagnostic uses alone, nor does it seek to endorse the methodology of one professional organization over another.  While capturing the essence of the definitions used by the professional organizations, it also is used to determine eligibility for disability benefits.  SSA's definition establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations.

Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018, 20022 (Apr. 24, 2002).  The Tenth Circuit has adopted this reasoning, and requires the Commissioner to determine "deficits in adaptive functioning" by reference to "any of the measurement methods recognized and endorsed by the [four major] professional organizations [dealing with mental retardation]." *Barnes*, 116 F. App'x at 942.

6

*Discussion*

Here, the government does not dispute that Laflan satisfies the severity test under paragraph (C). Thus, the question is whether Laflan satisfies the capsule definition. More precisely, given this Court's limited standard of review, the question is whether the ALJ applied the right legal test in determining that the capsule definition was not satisfied, and whether her factual findings are supported by substantial evidence.

The ALJ did not discuss the test in explicit terms of separate capsule definitions and severity tests, nor did she address paragraph (C). Rather, the ALJ's total analysis as to Listing 12.05 was:

> [T]he medical evidence includes a verbal comprehension IQ score of 70, leading to a diagnoses of borderline intellectual functioning, not mild mental retardation as counsel argues (*See* ex. 4F). Moreover, the evidence is not consistent with a diagnosis of mild mental retardation because it does not document significant deficits of adaptive functioning in at least two of the skill areas required under section 12.05. These conclusions are supported by the assessments of two state agency psychological consultants (*See* ex. 4A; Prior File, DDE).

(AR 31.) Contrary to Laflan's argument, this appears to apply substantially the correct legal test, even if it is not stated precisely correctly. Although Listing 12.05 does not "require" the ALJ to look for limitations in "at least two [] skill areas," it does *allow* the ALJ to do so—because that is the test for deficits in adaptive functioning endorsed by the DSM-IV. *See* Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. at 20022 ("accompanied by significant limitations in *at least two of the following skill areas*: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work,

leisure, health, and safety" (emphasis added)). In reviewing an ALJ's opinion, this Court does not "insist on technical perfection," *Keyes-Zachary*, 695 F.3d at 1166, and by all appearances the ALJ identified an appropriate legal standard.

That said, the ALJ's discussion is not supported by substantial evidence. The only evidence cited by the ALJ on the question of deficits in adaptive functioning are "the assessments of two state agency psychological consultants"—the one from this determination, and the one from Laflan's previous application for disability benefits. The records from the previous application are not part of the record on appeal in this case, and as a result the Court cannot determine whether it supports the ALJ's analysis. But the assessment of the state agency psychological consultant from Laflan's *current* application is in the record—and it does not offer support for the ALJ's finding. The consultant filled out a Mental Residual Functional Capacity ("RFC") Assessment, offering opinions on Laflan's degree of functional limitation in a variety of work-related areas. (AR 188–90 (opinion of Gayle Frommelt, Ph.D.).) None of those opinions deal explicitly with the "skill areas" identified in DSM-IV—nor would one expect them to, because the residual functional capacity assessment is an administrative determination and not a medical one.[2]

Moreover, to the extent the ALJ might have drawn inferences as to "adaptive functioning" skill areas from the state agency's RFC analysis, those inferences would

---

[2] In fact, the mental RFC assessment overlaps quite neatly with the *severity* criteria under Listing 12.05's paragraph (D)—suggesting that it is, in fact, an entirely different inquiry than "deficits in adaptive functioning" in the capsule definition. Certainly, if the inquiries overlap at all, the capsule definition must be a lower, easier-to-meet standard—because otherwise, paragraph (D) would be superfluous.

need to be drawn the other way. The state agency's RFC analysis found moderate limitations in three out of six types of workplace social interactions; it found moderate limitations in three out of seven persistence-and-pace functions; and it found a moderate limitation as to Laflan's ability to "respond appropriately to changes in the work setting." To the extent inferences as to the DSM-IV's "skill areas" can be drawn solely from this RFC assessment, they can be reasonably drawn in Laflan's favor only.

*Remedy*

The evidence cited by the ALJ does not support the ALJ's determination.[3] As a result, the case must be remanded—either for further proceedings, or to render benefits. The Court may only render benefits if the record already conclusively establishes that Laflan satisfies the capsule definition in Listing 12.05. *See Sorenson v. Bowen*, 888 F.2d 706, 713 (10th Cir. 1989).

The record is replete with evidence of significant "deficits in adaptive functioning." For example, Laflan was held back in school three times (in the second, sixth, and seventh grades), ultimately dropping out, pregnant, at the age of 18—*while still in the eighth grade*. (AR 275-77; 359, 406.) Further, Laflan has never managed to keep a job for more than a few months, working off-and-on at mostly minimum-wage positions from the age of 15 through 22—never earning as much as $5,200 in any one year. (AR 191,

---

[3] The government relies on the ALJ's citation to Exhibit 4F, rather than her citation to Exhibit 4A. But the ALJ did not cite Exhibit 4F in her discussion of deficits in adaptive functioning; she cited it for its diagnosis and IQ score, before moving on to discuss evidence as to adaptive functioning as a separate inquiry. Further, the government rests its entire argument on the distinction between a diagnosis of mild mental retardation and one of borderline intellectual functioning in the DSM-IV—but a claimant's impairments are not medical diagnoses. They are administrative determinations reserved to the Commissioner.

9

274.) She has never had a driver's license. (AR 407.) She is functionally illiterate. (Entire record.) At least one consultative examiner felt she should not be trusted with her own funds. (AR 416.) Two out of three psychological examiners felt that her social interactions were inhibited. (AR 189, 361, 416.) Looking at the DSM-IV's "skill areas"— "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety"— there is substantial evidence suggesting that Laflan is significantly limited in at least two.[4]

That said, the record is not uniform. There are portions of the record that suggest normal functioning in at least some of the DSM-IV skill areas. (*See, e.g.*, AR 315 (Laflan reports that she takes care of her kids, and most household/living activities).) Because it is not this Court's place to weigh the evidence, the Court finds that further proceedings are appropriate. And because the government has already conceded that the severity test in paragraph (C) is met, the remand is limited to further fact-finding on the sole question of whether Laflan has "deficits in adaptive functioning" sufficient to meet Listing 12.05's capsule definition.

II. **Duty to Develop Record as to Physical Impairments**

Laflan further argues that, as to physical limitations, the ALJ failed to develop the record sufficiently. "In a social security disability case, the claimant bears the burden to prove her disability." *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009) (internal quotation marks omitted). But because "administrative disability hearings are

---

[4] The Court notes that, because paragraphs (A) through (D) test for "severity," one would not expect the threshold test in Listing 12.05 to be particularly onerous.

nonadversarial . . . the ALJ has a duty to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Id.* "Further, this duty pertains even if the claimant is represented by counsel." *Id.* at 1063. Accordingly, the ALJ was required to gather enough evidence to evaluate Laflan's functional capacity and make a disability determination. "'The standard' for determining whether the ALJ fully developed the record 'is one of reasonable good judgment.'" *Segura v. Barnhart*, 148 F. App'x 707, 710 (10th Cir. 2005) (quoting *Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997)). If there is sufficient information to make a disability determination, the record is sufficiently developed. *Cowan v. Astrue*, 552 F.3d 1182, 1187 (10th Cir. 2008) ; 20 C.F.R. § 404.1520b.

An adequate record exists here. Most importantly, Laflan was examined by a consultant who found no physical limitations. Further, as the ALJ exhaustively recounted, the objective medical records provide no basis for believing that Laflan suffers from any physical functional limitations. *Cf. Kelley v. Chater*, 62 F.3d 335, 338 (10th Cir. 1995) (absence of restrictions or opinions of disability from claimant's treating physicians supported ALJ's finding that he was not disabled). Moreover, without *some* evidence of a functional limitation from a condition, especially in a case where the claimant is represented by counsel, the ALJ has no duty to further develop the record as to that condition. *See Hawkins v. Chater*, 113 F.3d 1162, 1167–68 (10th Cir. 1997) ("[T]he starting place must be the presence of some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation."); *see also Rutledge v. Apfel*, 230 F.3d

11

1172, 1175 (10th Cir. 2000) (no duty to develop record further as to certain exertional factors where objective evidence did not suggest any impairment to those functions).

Finally, Laflan does not suggest what specific evidence the ALJ should have developed—an oversight that ends her duty-to-develop argument. *See, e.g.*, *Watson v. Barnhart*, 194 F. App'x 526, 530 (10th Cir. 2006) ("Watson neither (1) suggests what the omitted treatment evidence might reveal; nor (2) identifies anything in the record that would have reasonably notified the ALJ that such evidence existed."); *Jaramillo v. Massanari*, 21 F. App'x 792, 795 (10th Cir. 2001) ("She has not identified medical providers from whom records were missing nor did she ask assistance in obtaining any records. On appeal, she has failed to identify the evidence she claims the ALJ should have obtained. The ALJ did not violate the duty to develop the record.").

The Court rejects Laflan's second argument.

### III.  Cumulative Impact of Impairments in RFC Analysis

Laflan further argues that the ALJ failed to consider, as required by law, the combined effect of all her impairments—whether severe or not. *See* 20 C.F.R. § 404.1545(a)(2). But in order for Laflan's non-severe impairments to be considered, they must first be "impairments." Under the regulations, an "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 404.1508. "Symptoms are [the claimant's] own description" of "physical or mental

impairment. [The claimant's] statements alone are not enough to establish that there is a physical or mental impairment." 20 C.F.R. § 404.1528. The ALJ correctly found no abnormalities shown by medically acceptable techniques, with nothing other than Laflan's own statements supported them. Thus, Laflan established no physical impairments—nonsevere or otherwise—that the ALJ was required to address in the RFC analysis.

The Court rejects Laflan's third argument.

### IV. Conflict Between DOT and Vocational Expert's Testimony

Finally, Laflan argues that the vocational expert's testimony does not comport with the *Dictionary of Occupational Titles* ("DOT"), and the ALJ failed to reconcile the discrepancy. But the Tenth Circuit, in an unpublished decision, has adopted the rule that an ALJ has no duty to investigate potential conflicts between a vocational expert's testimony and the DOT, where the vocational expert affirmatively testifies that there are no conflicts relevant to the claimant's case. *Gibbons v. Barnhart*, 85 F. App'x 88, 93 (10th Cir. 2003) (quoting at length *Carey v. Apfel*, 230 F.3d 131, 146–47 (5th Cir. 2000)); *Phelan v. Astrue*, 2013 WL 24374, at *11 (D. Colo. Jan. 2, 2013) (Jackson, J.).

The Court rejects Laflan's fourth argument.

### Conclusion

For the reasons set forth above, the Commissioner's decision is VACATED and REMANDED for further fact-finding as to whether Virginia Francis Laflin meets Listing 12.05(C), and such other proceedings as the Administrative Law Judge deems appropriate.

13

Dated this 14th day of September, 2015.

                              BY THE COURT:

                              */s/ Michael J. Watanabe*
                              MICHAEL J. WATANABE
                              United States Magistrate Judge

Case 1:14-cv-03091-MJW   Document 28   Filed 09/14/15   USDC Colorado   Page 13 of 13